# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| DELINEAR, INC.,<br>536 Fourteenth Street, Suite No. 4<br>San Francisco, CA 94103<br>a California corporation, on behalf of itself<br>and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE LUFTHANSA AG,<br>LUFTHANSA CARGO AG,<br>ASIANA AIRLINES, INC.,<br>CATHAY PACIFIC AIRWAYS LTD.,<br>JAPAN AIRLINES INTERNATIONAL<br>COMPANY LTD., KOREAN AIR LINES<br>CO., LTD., ALL NIPPON AIRWAYS<br>CO., LTD., NIPPON CARGO AIRLINES<br>CO., LTD., SINGAPORE AIRLINES,<br>LTD., SINGAPORE AIRLINES CARGO<br>PTE LTD., AIR CANADA, AIR<br>FRANCE-KLM GROUP ADS, AIR<br>FRANCE-KLM CARGO ADS, BRITISH<br>AIRWAYS PLC, CARGOLUX<br>AIRLINES INTERNATIONAL, S.A.,<br>LAN AIRLINES S.A., LAN CARGO,<br>S.A., SAS AB, SCANDINAVIAN<br>AIRLINES SYSTEM, SAS CARGO<br>GROUP A/S, SWISS INTERNATIONAL<br>AIRLINES LTD., VIRGIN ATLANTIC<br>AIRWAYS LIMITED.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT**<br>**(15 U.S.C. § 1)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff **DELINEAR, INC.** ("Plaintiff"), individually and on behalf of the Class described

below, brings this action for treble damages and injunctive relief under the Sherman Antitrust Act

of 1890 (15 U.S.C. §§ 1 *et seq.*) and Sections 4 and 16 of the Clayton Antitrust Act of 1914 (15

U.S.C. §§ 15 and 26) against Defendants, demanding a trial by jury. Plaintiff complains and alleges upon information and belief except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1.      Plaintiff brings this lawsuit as a class action on behalf of all individuals and entities who purchased international air cargo shipping services for business or commercial purposes from Defendant air cargo carriers, their subsidiaries, agents, or co-conspirators, during the period between January 1, 2000, and the present, including but not limited to all individuals and entities who purchased international air cargo shipping services through intermediary freight forwarders under agreements that required them to pay the entirety of Defendants' illegal surcharges.

2.      During the relevant period, the market price for international air cargo shipping services was inflated because of collusive behavior. Basic shipping charges were ostensibly competitive. In fact, over a 15-year period, base cargo rates had declined. However, the published cargo rates were deceptive, in that they did not include substantial surcharges Defendants began adding in 2000. Those uniform, agreed-upon additional fees took the form of surcharges ostensibly imposed to recover external charges for fuel, mandatory security measures (including but not limited to customs clearing) following the September 11, 2001 terrorist attacks on the United States, and war-risk insurance following the United States' military response to those attacks. Often imposed without detailed explanation, those surcharges have significantly inflated the cost of international air cargo shipping services.

3.      Defendants, together with their co-conspirators, participated in a conspiracy, substantially in this district, to fix or maintain the prices of international air cargo shipping services. Because of Defendants' unlawful conduct and conspiracy, Plaintiff and other members of the Class paid artificially inflated prices for international air cargo shipping services. Plaintiff and other

members of the Class purchased those services and have been damaged thereby. Plaintiff and the other Class members purchased those services either directly or under agreements with freight forwarders who contracted directly with the Defendant airlines and collected Defendants' collusively set surcharges from Plaintiff and the other Class members.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and injunctive relief, and the costs of suit, including reasonable attorneys' fees, against Defendants and their unnamed co-conspirators for the injuries sustained by the Plaintiff and the members of the Class which it represents for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      This  Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. §§ 15, 22 and 26.

6.      This Court has general and specific personal jurisdiction over each of the named Defendants. Each of the Defendants was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing, located or doing business in the United States, including, but not limited to, this district. At all relevant times, each of the Defendants marketed and sold international air cargo shipping services to purchasers in the United States, including but not limited to, this district.

7.      Venue is properly laid in this district under 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391 (b) and (c), because Defendants transact business, maintain offices, or are otherwise found within this district; and many of Defendants' unlawful acts giving rise to Plaintiff's claim occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the

3

Clayton Act, 15 U.S.C. §§ 15(a) and 26.

9.    No other forum would be more convenient for the parties and witnesses to litigate this case.

10.    The business activities of Defendants and their co-conspirators which are at issue in this Complaint were within the flow of and substantially affected interstate trade and commerce. There has been a continuous and uninterrupted flow of international air cargo shipping transactions in interstate commerce throughout the class period.

## PARTIES

### Plaintiff

11.    Plaintiff Delinear, Inc. ("Plaintiff") is a California Corporation having its principal place of business at 536 Fourteenth Street, Suite No. 4, San Francisco, CA 94103 San Francisco, California. Plaintiff is a rug merchant that ships products domestically and internationally.

12.    During the time period alleged in this complaint, Plaintiff was injured and suffered damages by reason of the antitrust violations alleged herein. Specifically, Plaintiff purchased one or more of the Defendants' international air cargo shipping services through freight forwarders under contracts that required Plaintiff to pay all surcharges imposed by the carrier airlines. The freight forwarders collected fuel, security and war risk surcharges from Plaintiff based solely on the fuel surcharges imposed by Defendants, and as such was Defendants' agent in collecting the fuel surcharge.

13.    As reported by the International Federation of Freight Forwarders Associations in its 2005 Annual Report, the airlines require freight forwarders to collect surcharges on their behalf.

14.    In a press release dated October 18, 2004, DHL acknowledged that:

DHL Danzas Air & Ocean is now receiving notification letters from our Airline Partners announcing they are again increasing their Fuel Surcharges[.] . . . DHL Danzas Air & Ocean has no option but to pass this increase along.

4

15.    On October 6, 2005, DHL Danzas announced:

[O]ur carrier partners have notified us that, they will again increase their fuel surcharge to us, in line with their published index notification system. As a result, DHL Danzas Air & Ocean will implement the following fuel surcharge increases.

16.    In the same press release, DHL Danzas characterized the fuel fee as an "*Industry FSC.*" On February 10, 2006, DHL Danzas again announced:

DHL Danzas Air & Ocean is now receiving notification letters from our Airline Partners announcing they are increasing their Fuel Surcharges. The new increases will be effective February 16th, 2006.

**Defendants**

17.    Defendant DEUTSCHE LUFTHANSA AG ("Lufthansa") is a German business entity based in Frankfurt, Germany. Lufthansa has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

18.    Defendant LUFTHANSA CARGO AG ("Lufthansa Cargo") is a German business entity that has participated in substantial business dealings in this district including the sale of international air cargo shipping services. According to its internet website, Lufthansa Cargo's "network covers 493 destinations on all 5 continents [and] is one of the leading freight airlines within the IATA rankings." The International Air Transport Association ("IATA") has ranked Lufthansa as high as second in tonne-kilometers flown internationally. As reported by *Air Cargo World Online* on May 12, 2005, Lufthansa Cargo "generated $40 million from fuel surcharges" in the first quarter of 2005.

19.    Defendant ASIANA AIRLINES, INC. ("Asiana") is a Korean corporation with its principal place of business in Seoul, South Korea, and California headquarters at 3530 Wilshire Blvd., Suite 1700, Los Angeles, CA 90010. Asiana has participated in substantial business dealings in this district including the sale of international air cargo shipping services. The Association of

Asia-Pacific Airlines has reported that Asiana derives 29% of its revenues from air cargo.

20.    Defendant CATHAY PACIFIC AIRWAYS LTD. ("Cathay Pacific") is a Hong Kong corporation having its principal place of business at Hong Kong International Airport, Cathay City, Lantan, Hong Kong. Cathay Pacific does business in this district and has participated in substantial business dealings in this district including the sale of international air cargo shipping services. As reported by the Association of Asia-Pacific Airlines, air cargo accounts for 28.5% of Cathay Pacific's revenue. With Cathay Pacific Cargo, its air cargo unit, Cathay Pacific is the leading air cargo carrier in Hong Kong; IATA has ranked Cathay as high as fourth worldwide, and sixth in international and domestic volume. On November 15, 2005, Cathay Pacific reported that, "Cathay Pacific is currently the world's sixth largest air cargo carrier by volume." According to the same report, Cathay Pacific operates 21 flights between Asia and the United States each week, including this district.

21.    Defendant JAPAN AIRLINES INTERNATIONAL COMPANY LTD. (formerly known as Japan Air Lines Company, Ltd.) ("Japan Air") is a Japanese corporation having is principal place of business in Tokyo, Japan. Japan Air does business in this district and has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

22.    Defendant KOREAN AIR LINES CO., LTD. ("Korean Air") is a Korean corporation having its principal place of business in Seoul, South Korea, with California headquarters at 6101 West Imperial Highway, Los Angeles, California 90045. Korean Air is the largest air cargo carrier in the world, ranking first in tonne-kilometers flown. According to the Association of Asia-Pacific Airlines, 32.7% of Korean Air's revenues come from air cargo. IATA ranks Korean Air first in tonne-kilometers flown. Korean Air has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

6

23.    Defendant ALL NIPPON AIRWAYS CO., LTD. ("Nippon") is a Japanese corporation headquartered in Tokyo, Japan that has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

24.    Defendant NIPPON CARGO AIRLINES CO., LTD. ("Nippon Cargo") is a Japanese corporation headquartered in Tokyo, Japan that has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

25.    Defendant SINGAPORE AIRLINES, LTD. ("Singapore Air") is a Singapore corporation and is headquartered in Singapore.  Singapore Air does business in this district and has participated in substantial business dealings in this district including the sale of international air cargo shipping services.  IATA ranks Singapore third in tonne-kilometers flown.

26.    Defendant SINGAPORE AIRLINES CARGO PTE LTD ("Singapore Air Cargo") is a Singapore corporation that does business in this district and has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

27.    Defendant AIR CANADA ("Air Canada") is a Canadian corporation headquartered in Quebec, Canada.  Air Canada has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

28.    Defendant AIR FRANCE-KLM GROUP ADS ("Air France") is a French corporation and has its principal place of business in Paris, France.  Air France-KLM is the product of the May 2004 merger of Air France and KLM NV, and is sued based on its own conduct and the conduct of its predecessors. Air France has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

29.    Defendant AIR FRANCE-KLM CARGO ADS, a division of Air France-KLM ("Air France Cargo"), is a French corporation that has participated in substantial business dealings in this district including the sale of international air cargo shipping services.  On January 27, 2005, Air

7

France-KLM announced:

> Since the Air France-KLM Group was set up, the two airlines have developed a deeper and closer cooperation in their cargo businesses. They have made significant progress in achieving synergies such as network management, capacity swaps and coordinating freighter schedules. In addition, KLM has joined SkyTeam Cargo.

> The founding principle of Air France-KLM is **"One group, Two airlines, Three core businesses"**. Hence, the focus in the coming years will broadly be on realizing synergies and not on organizational integration. However, in certain specific sectors, such as cargo, joint entities will be introduced if justified by a strong business rationale.

> As part of this strategy, and as announced on 14 May 2004, Air France and KLM have decided to create a unified management body in their cargo businesses, called **"Cargo European House"**, which should be operational by the end of 2005. This team will be in charge of **network management, marketing and sales**, with each airline continuing to manage its own operations.

> The aim of this initiative is:

> - *to create a single commercial offer* for optimum customer benefits;

> - to consolidate and develop the position of Air France Cargo and KLM Cargo based on the dual-hub strategy with Charles de Gaulle and Schiphol as cornerstones;

> - to secure the ongoing performance improvement in cargo and fully realize the substantial synergy potential.

In October 2005, Air France Cargo and KLM Cargo announced the integration of their commercial management teams:

> A Joint Cargo Management Team will lead the organization worldwide. Within the team, now 60-70 managers have been appointed. This is the first step of forming a Joint Cargo Management Team. This team is responsible for the *integrated commercial functions, including sales*, customer service, products, marketing, *revenue management* and network planning.

30.    Defendant BRITISH AIRWAYS PLC ("British Airways") is a United Kingdom corporation with its principal place of business in Harmondsworth, Middlesex, England. British Airways does business in this district and participated in substantial business dealings in this district including the sale of international air cargo shipping services. British Airways is one of the 10

largest air cargo carriers in the world, and ranked fifth as recently as 2003.

31.    Defendant CARGOLUX AIRLINES INTERNATIONAL, S.A. ("Cargolux") is a Luxembourg corporation based in Luxembourg, Grand-Duchy of Luxembourg, that does business in this district and has participated in substantial business dealings in this district including the sale of international air cargo shipping services.  It has been ranked in IATA's top 10 international air carriers in volume flown.

32.    Defendant LAN AIRLINES, S.A. (formerly known as LAN Chile, S.A.) ("LAN") is a Chilean corporation headquartered in Santiago, Chile.  LAN has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

33.    Defendant LAN CARGO, S.A. ("LAN Cargo") is a Chilean corporation.    A subsidiary of LAN, it is also headquartered in Santiago, Chile.  LAN Cargo has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

34.    Defendant SAS AB is a Swedish corporation and has its principal place of business in Stockholm, Sweden.  SAS AB has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

35.    Defendant SCANDINAVIAN AIRLINES SYSTEM ("SAS") is a Swedish corporation and has its principal place of business in Stockholm, Sweden.  SAS has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

36.    Defendant SAS CARGO GROUP A/S ("SAS Cargo"), a subsidiary of SAS, is a Swedish corporation and has its principal place of business in Stockholm, Sweden.  SAS Cargo has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

37.    Defendant SWISS INTERNATIONAL AIRLINES LTD. ("Swiss Air") is a Swiss corporation headquartered in Basel, Switzerland. Swiss Air does business in the United States of America as SWISS AIR and has participated in substantial business dealings in this district including the sale of international air cargo shipping services. Swiss Air's cargo division is SWISS WORLD CARGO.

38.    Defendant VIRGIN ATLANTIC AIRWAYS LIMITED ("Virgin Atlantic") is a United Kingdom corporation that has participated in substantial business dealings in this district including the sale of international air cargo shipping services.

39.    Defendants Lufthansa, Lufthansa Cargo, Asiana, Cathay Pacific, Japan Air, Korean Air, Nippon, Nippon Cargo, Singapore Air, Singapore Air Cargo, Air Canada, Air France, Air France Cargo, British Airways, Cargolux, LAN, LAN Cargo, SAS, SAS Cargo, Swiss Air and Virgin Atlantic are collectively referred to as "Defendants."

40.    Defendants, their corporate parent companies, officers, directors, agents, employees or representatives performed, authorized, ordered, and/or condoned the acts alleged in this complaint. These acts were done while engaged in the management, direction, control or transmission of the Defendants' business affairs.

## CO-CONSPIRATORS AND AGENCY

41.    On information and belief, at all relevant times, other Airfreight Carriers, trade groups, or other entities, referred to herein as John Does I-X, willingly conspired with Defendants in their unlawful restraint on trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

42.    Certain other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracies alleged in this complaint. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed

acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

43.    At all relevant times, each Defendant was and is the agent of each of the remaining

Defendants, and in doing the acts alleged herein, was acting within the course and scope of such

agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

Defendants, and each of them, are individually sued as participants and as aiders and abettors in the

improper acts, plans, schemes, and transactions that are the subject of this complaint. Defendants,

and each of them, have participated as members of the conspiracy or acted with or in furtherance of

it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts

and made statements in furtherance of the violations and conspiracy.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action both on behalf of itself, and as a class action pursuant to

Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following Class (the "Class"):

> **All individuals and entities who, during the period from at least
> January 1, 2000 through the present (the "Class Period"),
> purchased international air cargo shipping services for business
> or commercial purposes from the Defendants, their subsidiaries,
> or their co-conspirators, <u>including but not limited to</u> all
> individuals and entities who purchased international air cargo
> shipping services through intermediary freight forwarders
> during the Class Period under agreements that required them to
> pay Defendants' entire surcharges, but <u>excluding</u> Defendants and
> their parents, subsidiaries, affiliates, all governmental entities,
> and co-conspirators.**

45.    Although Plaintiff does not know the exact number of Class members, since such

information is the exclusive control of Defendants, Plaintiff believes that due to the nature of the

trade and commerce involved Class members are sufficiently numerous, most likely tens of

thousands of purchasers, and geographically dispersed throughout the United States such that joinder

of all Class members is impracticable. The information as to the identity of the Class members can

be readily determined from records maintained by Defendants and their agents, including but not

limited to freight forwarders who have supplied Defendants with shipping business during the Class Period.

46.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff is a purchaser of international air cargo shipping services, all Class members were damaged in the same manner by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

47.     Numerous questions of law and fact that are common to the Class arise from Defendants' anticompetitive conduct.  Among those common questions of law and fact are:

a.      Whether Defendants engaged in a contract, combination or conspiracy among themselves and/or their co-conspirators to raise, fix, maintain, peg or stabilize the prices of international air cargo shipping services sold in the United States;

b.      The identities of the co-conspirators;

c.      The duration of the conspiracy and the nature and character of the acts done in furtherance of the conspiracy;

d.      Whether the conspiracy violated Section 1 of the Sherman Act;

e.      Whether Defendants actively concealed the contract, combination or conspiracy from Plaintiff and other Class members;

f.      Whether the conduct of Defendants and their co-conspirators caused prices of international air cargo shipping services to be artificially inflated to non-competitive levels; and

g.      Whether Plaintiff and other members of the Class were injured by the conduct of Defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

12

h.      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

48.     These common questions of law and fact are common to the Class, and predominate over any other questions affecting only individual Class members.

49.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a typical purchaser of international air cargo shipping services and has no conflicts with any other member of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in antitrust and class action litigation.

50.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties in management that would preclude maintenance as a class action.  Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

51.     Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

52.     Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

## TRADE AND COMMERCE

53.     During the Class Period, Defendants and their co-conspirators made a substantial

number of sales of international air cargo shipping services in a continuous and uninterrupted flow of interstate and international commerce to customers located in states and countries other than the states in which Defendants and their co-conspirators are located.

54.    The business activities of Defendants and their co-conspirators that are the subject of this Complaint were within the flow of, and substantially affected, interstate and foreign trade and commerce.

55.    During the Class Period, Defendants have made most of the sales of international air cargo shipping services in the global market, controlling the vast majority of the market for international air cargo shipping services.

## THE MARKET FOR INTERNATIONAL AIR CARGO SHIPPING SERVICES AND THE COLLUSIVE SETTING OF RATES IN THAT MARKET

### A.    The Market for Air Cargo Shipping Services

56.    Primarily used for shipment of perishables, documents and other goods for which delivery is an urgent matter, air cargo shipping services are among the most expensive methods of transporting goods from one place to another.

57.    A customer choosing to ship goods by air has several alternatives. The customer may tender their cargo directly to an all cargo airline such as Federal Express (FedEx) or United Parcel Service (UPS). However, the passenger airlines are also in the air cargo shipping business, selling excess aircraft space on passenger flights and in some cases, operating their own fleets of cargo jets. Carriers frequently cooperate with one another in air cargo shipping, setting aside as much as 10 percent of their cargo space for one another.

58.    Airlines also sell large blocks of space, called pallet positions, to freight forwarders at discounted rates. Those intermediaries then sell space to the actual shippers. Freight forwarders collect surcharges imposed by the airlines as agents of the airlines as a separate cost.

14

59.    It is more efficient and convenient for the airlines to sell their cargo space to freight forwarders than it is for them to sell it in smaller blocks to individual sellers. Conversely, it is often more efficient and convenient for a shipper with multiple shipments to use a freight forwarder, because the freight forwarder can arrange different transportation methods depending on the nature and urgency of the shipment. As a result, most business and commercial shipping customers purchase air cargo shipping services from the airlines through freight forwarder intermediaries.

**B.    International Air Cargo Shipping**

60.    Worldwide, shippers spend an estimated $50 billion per year for air cargo shipping services. Boeing's biennial 2004/2005 World Cargo Forecast reported that in 2003, carriers flew 156,241 tonne-kilometers of international air cargo. According to IATA, 12% of all aviation revenues are derived from cargo.

61.    IATA and aircraft manufacturers Boeing and Airbus all publish projections on air cargo traffic growth, and all suggest that demand for transpacific cargo services will be a major growth area in the coming years.

62.    In a Five-Year forecast dated October 31, 2005, IATA projected an annual growth rate of 6.0% for the transpacific cargo shipments. IATA's Freight Forecast 2005-2009 noted the 15.8% growth in international cargos in 2004, projecting a growth rate of 6.3% overall in 2006, and 7.1% for transpacific routes.

63.    Boeing's 2004/2005 World Cargo Forecast projected a 6.2% annual growth rate for world air cargo. Although Boeing forecasts the greatest growth to occur within Asia, the next major growth area is the Asia-North America route:

> The forecast trade for eastbound trade (Asia to North America) and westbound trade (North America to Asia) is forecast to average 7.2% per year over the next 20 years. The eastbound growth is forecast to be 7.2% per year, with westbound growth slightly higher at 7.3% over the 2003-2023 time period.

According to Boeing, "Japan and China account for more than 50% of the transpacific air cargo tonnage."

64.      Airbus also projected strong growth for the transpacific market in its 2004-2023 Global Market Forecast.  Airbus projects a 5.9% overall growth rate for air cargo traffic, and a 7.5% annual growth rate for North America-Pacific Rim shipments.  In projected rankings, the Pacific Rim-North America route was second with 7.9% of world cargo tonne-kilometers, and the Asia-North America route was third with 7%.  Overall, Airbus projected that transpacific shipments would account for over 1/4 of all international air cargo shipments by 2023 based on a 6.5% annual growth rate.

65.      In addition, Airbus reported that "although high-tech goods from Asia to North America account for 40% of total exports in tonnage, they also account for nearly 75% in value."

C.      **Air Cargo Services Pricing**

66.      In general, basic air cargo shipping rates are computed based on a cost per pound basis, the size of the shipment, and in some instances, distance.  Larger shipments may be charged at a lower rate than small shipments, and freight forwarders receive highly preferential rates for the large blocks of cargo space they purchase.  The nature of the cargo – *i.e.*, whether it is hazardous, bulky or fragile – may also affect the rate.  For example, most carriers will calculate a dimensional weight for a package (*i.e.*, what the package should weigh based on its dimensions) and assess an additional charge for heavier packages.  In addition, some airlines charge multi-zone rates, *i.e.,* rates that depend on the distance the cargo is shipped.  Finally, the basic cargo rate may depend on the level of service, that is, how quickly the shipper needs the package to arrive at its destination.

67.      Air cargo rates are not subject to federal or state regulation.  The Civil Aeronautics Act of 1938 and the 1958 Federal Aviation Act gave way to deregulation beginning in the 1970's.  The air cargo industry deregulated itself in 1977, and the Civil Aeronautics Board was dissolved in

1985. With the Federal Aviation Act of 1994, Congress eliminated all forms of economic regulation of the airline industry.

68.    Carriers compete with one another in their basic air cargo rates and passenger rates, and competition for customers is sufficiently vigorous that when a carrier raises its basic rates, its competitors will not follow. That is true for both air passenger and air cargo rates. Services are fungible, in that space on one plane to a destination is a ready substitute for space on another. As a result, price is the primary factor driving customer choice as between air cargo carriers.

69.    Competition for passenger business has kept airfares low enough that airlines now depend substantially on cargo revenues for their profits. Basic cargo rates do not provide those profits, because competition has kept those rates low, as well. Instead, the airlines derive their profits largely through the imposition of surcharges for fuel, security, and insurance. Those surcharges can result in an air cargo customer paying twice the quoted charge. Although the airlines attempt to justify those surcharges as a means to recover external costs, the relationship to those costs is tenuous; the surcharges are disguised, fixed fees.

**D.    Defendants' Conduct Caused the Price for International Air Cargo Services to be Inflated Above Competitive Levels.**

70.    Beginning in 2000 and continuing to the present day, Defendants have combined and conspired to fix the prices of surcharges added to international air cargo shipping rates (the "Surcharges") to raise and maintain the amount of those Surcharges above competitive levels.

71.    Prior to 2000, competition among air cargo carriers resulted in generally lower rates for air cargo services. For basic shipping rates, that remains so to this day; in fact, basic shipping rates are lower now than they were 15 years ago. However, Defendants have adopted common, uniform Surcharges over and above their basic cargo rates, often imposed on consumers without detailed explanation, to raise and maintain air cargo shipping costs above competitive levels.

72.    Defendants' collusive Surcharges include added fees for fuel, security measures (including but not limited to customs clearing) following the September 11, 2001 terrorists attacks on the United States, and war-risk insurance costs imposed following the United States' military response to those attacks.

73.    As reported on Forbes.com on March 8, 2006, members of IATA:

[F]irst sought permission from US regulators to impose such charges on air-cargo rates in 2000.

But the request was rejected by federal regulators who said it was *'fundamentally flawed and unfair to shippers.'* They said that the charges would remain high even if fuel costs fell and they were improperly based on spot-fuel prices, when most carriers have long-term contracts and use hedging to smooth cost spikes.

74.    Based on publicly available information, it is estimated that the total Surcharges for the four major international routes were $635 million in 2000, $305 million in 2001, $1.2 billion in 2002, $2.17 billion in 2003, $2.9 billion in 2003, and $4.69 billion in 2005.

75.    Defendants' agreement to charge uniform Surcharges is reflected in their lockstep price increases. Although IATA denies involvement in their setting, Surcharges are billed using a uniform set of IATA-approved codes.

76.    In an April 29, 2002 press release, freight forwarder Danzas AEI Intercontinental expressed that "Shippers and forwarders have long been concerned over airline policies of imposing fuel surcharges that stay in place even after fuel prices have declined." To address that issue, it proposed a uniform system of calculating fuel surcharges based on the United States Department of Energy's first Monday of the month per gallon spot price index for U.S. Gulf Coast jet fuel.

77.    Following that proposal, Defendants did in fact agree to calculate fuel surcharges based on index prices. Today, a majority of carriers use a an index-based fuel surcharge formula developed by Lufthansa. That index is based on the average of spot prices for jet fuel in the Rotherham, Mediterranean, Far East, Singapore, United States West Coast and United States Gulf

Coast markets. British Airways Cargo uses Northwest, Singapore, Los Angeles, and U.S. Gulf Coast prices to calculate its fuel prices. However, even when carriers publish and use ostensibly different methodologies for calculating their fuel price surcharge, the results are uniform.

78.    Nor do the fuel surcharges reflect the carriers' actual fuel costs per shipment. This is so for three reasons. First, the surcharge is imposed by weight, rather than distance. Second, it does not take into account differences in fuel efficiency between aircraft. Finally, the uniform surcharge does not reflect differences in purchasing strategies between airlines, *i.e.*, whether hedging makes it less likely that their actual costs are subject to spot market fluctuations. According to *World Trade Magazine*'s February 1, 2006 issue:

> *Between May 2005 and October 2005, fuel surcharges on international flights jumped from 20 cents per kilo to 60 cents per kilo. On many trans-Atlantic flights, the surcharges climbed as high as the carrier's base rate, which meant that shippers ended up paying twice the normal freight costs.*
>
> Strangely enough, *the surcharges aren't applied proportionately*, which makes it all the harder for shippers to plan, says Julian Keeling, President and CEO, Consolidators International, Inc. "You'd think that a fuel surcharge would increase as the flight distance increased, right?," he asks. "But it doesn't. *There's not a predictable relationship between the fuel surcharge and the actual operating cost.* For instance, the surcharge on a trans-Tasman flight between Sydney and Melbourne is 60 cents a kilo. It's the same rate on a flight all the way from New York to Australia. It doesn't make sense. *What the airlines have basically done is used the fuel surcharge to increase rates, because for the last 15 years rates have been declining. And, every time an airline has tried to push through higher base rates, other airlines haven't followed suit.*"

79.    In its 2005 Annual Report, IATA projected that:

> In 2005, fuel will constitute *22%* of airlines' operating costs. That means a total fuel bill of US$83 billion, up from US$61 billion in 2004 and US$44 billion in 2003.

80.    However, as IATA also reported:

> There are an estimated 40 million globally scheduled air transport operations each year. Averaging 97 minutes each, and at US$100 per minute, the total operating costs approach US$400 billion annually.

In other words, fuel costs alone cannot justify a fuel fee equal to the total cargo shipping charge.

81.    That Defendants have combined or conspired to fix Surcharge rates is evident from the fuel surcharge increases announced in February 2006, when Defendants announced uniform increases in their fuel surcharges from 45 cents or .45 euro to 50 cents or .50 euro (or equivalent currency) per kilo.  In particular:

- Air Canada announced on February 9, 2006 that it was increasing its fuel surcharge effective February 20, 2006 to .50.

- Air France-KLM Cargo announced in early February that effective February 14 its fuel surcharge would go to .50 euro.

- Asiana announced on February 3, 2006 that effective February 14 its fuel surcharge would go to .50 euro.

- British Airways announced on February 2, 2006 that effective February 16 its fuel surcharge would go to GBPO .34 or .50 euro.

- Cargolux announced on February 4, 2006 that effective February 17 its fuel surcharge would go to .50 euro.

- Although Cathay Pacific did not make a formal announcement, as of February 15, 2006 its fuel surcharge as listed on the Cubic Air Cargo internet site was .50 euro.

- Japan Air's increase was reported as the headline, "JAL will raise fuel surcharges on its international flights again" in the January 23, 2006 online edition of *The Wing Newsletter, Japan's Aerospace and Aviation Weekly.*

- Korean Air's internet website listed an increase to .50 euro on several of its routes effective February 14, 16, 17 and 20, 2006.

- LAN Cargo announced on February 6, 2006 that effective February 20 its fuel surcharge would go to .50 euro.

- Lufthansa announced in early February 2006 that effective February 20 its fuel

surcharge would go to .50 euro.

- Nippon Cargo announced on February 2, 2006 that effective February 14 its fuel surcharge would go to .50 euro.

- SAS announced in early February that effective February 20, 2006 its fuel surcharge would go to .50 euro.

- Singapore Air's fuel surcharge was listed as .50 euro as of February 13, 2006 on the industry's flying-cargo.com website.

- Swiss Air announced on February 6, 2006 that it would raise its fuel surcharge effective February 20. Liberty International, a freight forwarder in Rhode Island, reported that the increased fuel surcharge was .50 euro.

- Virgin Atlantic announced on February 3, 2006 that effective February 16 its fuel surcharge would increase to .50 euro.

82.      In other words, irrespective of differences in actual costs because of hedging, aircraft fuel efficiency, flight distance or otherwise, in February 2006, the following Defendants had agreed to charge the same fuel surcharge fuel surcharge:

| Defendant | Surcharge |
| --- | --- |
| Air Canada Cargo | .50 euro |
| Air France-KLM Cargo | .50 euro |
| Asiana Cargo | .50 euro |
| British Airways World Cargo | .50 euro |
| Cargolux | .50 euro |
| Cathay Pacific Cargo | .50 euro |
| Korean Air Cargo | .50 euro |
| LAN Cargo | .50 euro |
| Lufthansa Cargo | .50 euro |

| Defendant | Surcharge |
|---|---|
| Nippon Cargo | .50 euro |
| SAS Cargo | .50 euro |
| Singapore Airlines | .50 euro |
| Swiss World Cargo | .50 euro |

83.     Uniform fuel surcharges have not been Defendants' only means of fixing international air cargo shipping charges.  As data reported by Flying-Cargo.com confirms, as of December 5, 2005, most of the Defendants' security surcharges were set at a uniform $0.15, irrespective of differences between localities in actual security costs:

| Defendant | Charge Type | Security Charge ($) |
|---|---|---|
| Air Canada | Actual Weight | 0.15 |
| Air France | Actual Weight | 0.15 |
| Asiana | Actual Weight | 0.15 |
| British Airways | Actual Weight | 0.13 |
| Cathay Pacific | Actual Weight | 0.15 |
| Cargolux | Actual Weight | 0.15 |
| Korean Air | Chrg Weight | 0.10 |
| LAN-Chile | Actual Weight | 0.15 |
| Lufthansa | Actual Weight | 0.10 |
| Singapore Airlines | Actual Weight | 0.15 |
| Swiss Air | Actual Weight | 0.10 |

84.     Defendants implemented the security surcharges after the FAA redefined the qualifications of "known shippers" and changed the way freight forwarders and carriers obtained new customers.  Prior to those amendments, a customer who made at least three shipments with the freight forwarder or carrier became a "known shipper."  Now, before a shipper can be classified as

22

a "known shipper," the shipper must make at least 24 shipments with the freight forwarder or carrier, or the freight forwarder or carrier must visit the shipper's site to ascertain that it is a business with a reason to ship its cargo by air.

85.    After the FAA promulgated those regulations, defendants quietly added lockstep security surcharges in the $0.10-$0.13/kg range.  Defendants attempted to justify imposing those charges by saying they needed to cover the cost of investing in new technology and personnel to screen packages.  Years later, the surcharges remain substantially the same.  Moreover, unlike fuel surcharges, which ostensibly rise and fall with jet fuel prices (despite differences in actual fuel costs to the airlines), the uniformly set security surcharges bear no relationship to any measurable standard or specified cost.  Quoted in a Purchasing.com newsletter on February 21, 2002, Rich Zablocki of Emery Air Freight correctly surmised that the security surcharge "is something the airlines used as a revenue generator."

86.    The uniformity of security surcharges shows that they bear little or no relationship to external costs, and instead have been imposed by Defendants as part of a contract, combination or conspiracy to raise and maintain prices above competitive levels.

87.    Defendants' war risk insurance surcharges are similarly imposed without regard to the true external cost, in that they do not allocate the overall cost of the insurance by distance traveled.

### E.    Defendants' Membership in Air Carrier Organizations, "Alliances" Have Facilitated Their Price Fixing.

88.    Several air cargo trade associations, an "alliance" among members of the conspiracy, and monthly meetings among Defendants' managers have provided opportunities for price information sharing among member air cargo carriers, thereby facilitating price fixing.

89.    The International Air Cargo Association ("TIACA") exists "to advance the interests

of the air cargo industry and strengthen its contribution to world trade expansion." Its members include, *inter alia*, Air Canada Cargo, Cargolux, Lan Cargo, Lufthansa, Nippon Cargo, and Virgin Atlantic Cargo. Every two years, the TIACA sponsors what it calls the "largest single gathering of leading businesses and senior executives in the air cargo industry."

90.    The International Air Transport Association ("IATA") describes itself as the "the prime vehicle for inter-airline cooperation in providing safe, reliable, secure and economical air services – for the benefit of the world's consumers." Of 260 IATA members in 140 nations, 20 are airlines, including Defendants Air Canada, Air France, Asiana, BA, Cargolux, Cathay Pacific, JAL, Korean, Lufthansa, NCA, SAS, Singapore and Swiss Air. Defendants have been able to exchange price data through the IATA's tariff conference system and in face-to-face meetings between IATA members.

91.    IATA has advertised the "benefits" of price information sharing on its internet website (http://www.iata.org/whatwedo/tariffs/benefits_airlines.htm):

**Access to Market Knowledge**

Participation in Tariff Coordination opens the door to sharing with other participants market and other types of intelligence required to price passenger and cargo tariff products. This shared market knowledge forms the basis for collective industry decision-making in which Members have a voice and an equal vote in establishing a rational global interline product.

92.    As reported by *Aviation Week & Space Technology* on February 19, 2006:

The EC has expressed concern about some of the data exchange--which involves face-to-face meetings between airline representatives--that it fears could lead to collusion.

93.    In a May 15, 2001 press release, the European Commission announced its disapproval of IATA cargo tariff conferences:

***In a statement of objections sent to the International Air Transport Association***

24

*(IATA), the European Commission has taken a preliminary view that the IATA cargo tariff consultations restrict competition and are no longer indispensable to provide customers with efficient interlining services within the EEA.*

Until June 1997 cargo tariff consultations benefitted of a block exemption under Commission Regulation No 1617/93, which effectively enabled European airlines to agree on tariffs for the carriage of freight.

Following the withdrawal of the block exemption by the Commission, IATA notified its cargo tariff consultation system under Council Regulation 3975/87 and applied for an individual exemption. The system notified by IATA is similar to that for which the block exemption was withdrawn.

According to IATA, the tariff conference system facilitates cargo interlining. Interlining occurs when cargo is carried for part or all of the journey by an airline other than the airline which sold the ticket. The cargo tariffs fixed by the tariff conferences are then used to calculate the participating carrier's compensation.

*It is the Commission's preliminary view that IATA cargo tariff conferences restrict price competition.* The Commission accepts that cargo tariff conferences facilitate the provision of a comprehensive system of interlining within the EEA but considers that until now *IATA has not succeeded in demonstrating that this restrictive system is indispensable to provide customers with efficient interlining services within the EEA.* In particular, the tariff conference system is 55 years old and dates from the time air transport markets were strictly regulated. Community airlines are currently in the process of building global networks. They also often interline on the basis of bilateral agreements.

94.    Equally important, the United States Department of Transportation has *refused* to grant antitrust immunity to the very sort of fuel surcharge agreement reflected in Defendants' practices. In its Order 2000-3-7, Agreements Adopted by Tariff Coordinating Conferences to the International Air Transport Association Relating to Cargo Rate Matters, the Department *denied* antitrust immunity to a proposed uniform fuel surcharge agreement based on the findings that:

The uniform, industry-wide index mechanism proposed here appears fundamentally flawed and unfair to shippers and other users of cargo air transportation. If the price of fuel spikes long enough to trigger a rate increase and then declines, but not enough to trigger its suspension, then shippers and users could be subjected, through this mechanism, to unjustified and unwarranted rate increases. To illustrate, assume the price of fuel, which has been averaging at about nineteen percent (63.63 cents per gallon) above the June 1996 base (53.35 cents per gallon), suddenly spikes to about 35 percent (72.30 cents per gallon), of the June 1996 base, just long enough to trigger a rate increase and then declines to average about twelve percent (59.75 cents per

gallon) above the June 1996 base of 53.35 cents per gallon. This decline would not be enough to trigger a suspension of the rate increase, yet the average cost of fuel would be over six percent (3.88 cents per gallon) less than the average price (63.63 cents per gallon) before the rate increase was triggered. However, shippers would still be paying increased rates that are higher than what they were paying before the increase was triggered, when fuel prices were actually higher.

Moreover, IATA's proposed index mechanism, which reflects the volatile nature of the spot market, is at best an imperfect measure of the impact of fuel price increases on carriers. Most carriers employ fuel hedging programs which they use to limit the effects of jet fuel price volatility and thus discipline their costs. Indeed, under these programs, many prudent carriers manage to hedge between 70-80 percent of their total fuel needs. To illustrate, as shown in the attachment to this order, the difference between the average actual fuel prices, as reported to the Department, for the three operating entities (Atlantic, Latin America and Pacific), measured between June 1996 and November 1999, increased about six percent, while IATA's index, based on spot market prices, showed a 34 percent increase over the same period. In these circumstances, the proposed mechanism cannot receive our approval.

95.     Nor are the IATA conferences the sole means to exchange price information.  As reported in the IATA's 2005 Annual Report:

CargoIS offers business intelligence on a lane-by-lane, or route-by-route, basis for air freight originating from 38 countries.  Derived from information contained on waybills settled through Cargo Account Settlement Systems (CASS) worldwide, CargoIS provides accurate and reliable market information on tonnage, revenue and shipment numbers to allow for better route planning and for performance benchmarking.

Among other things, this communication of customer information permits Defendants to determine the maximum levels of surcharges, in that it permits calculation of the prices at which air carriers will lose business to other forms of transportation.

96.     As reported in the *Wall Street Journal* on March 8, 2006, "The Justice department has been critical of IATA in the past, arguing that it is little more than a price-coordinating group."

97.     Skyteam Cargo ("Skyteam") describes itself as the world's leading air cargo alliance. In addition to AeroMexico Cargo, Alitalia Cargo, CSA Cargo and Delta Air Logistics, Skyteam's members include Defendants Air France Cargo, KLM Cargo (now Air France-KLM) and Korean Air Cargo.  According to the Skyteam internet site, Skyteam's US Cargo Joint Venture "offers

customers the benefits of a combined sales force, centralized reservation and service center, comprehensive route network and common product line for US export shipments." In December 2005, the United States Department of Transportation issued a tentative decision rejecting Skyteam's application for antitrust immunity after the United States Department of Justice opposed that application. The Skyteam alliance withdrew that application in January 2006.

98.    The WOW Cargo Alliance ("WOW") is an alliance of Lufthansa Cargo, SAS Cargo, and Singapore Airlines Cargo formed in 1999 and joined in 2002 by JAL Cargo to permit "closer co-operation in the air cargo business," including but not limited to integrated marketing and sales, among its members. With a claimed 20% market share as of August 2003, WOW is the world's largest cargo alliance offering "standard cargo products." An October 5, 2004 WOW press release stated that:

> According to the current IATA report, Lufthansa Cargo is the largest carrier in the international airfreight business. Singapore Airlines Cargo is the second largest and Japan Airlines Cargo the sixth largest. SAS Cargo operates a dense route network, primarily in northern Europe.

**F.    Meetings of Air Cargo Organizations and Secret Meetings Among Defendants' Managers Have Facilitated Their Price Fixing.**

99.    In addition to their membership in one or more of the above organizations and attendance at those organizations' meetings, Defendants' managers have held regularly monthly meetings at Air Canada offices and other locations to facilitate their collusive practices since at least January 2000.

100.    Defendants have also met to discuss joint strategies at industry group conventions. IATA's annual meeting is its World Air Transport Summit ("WATS") and Annual General Meeting ("AGM"). The meeting gathers airline executives from around the world for the express purpose of sharing information and crafting joint strategies. IATA's announcement of the June 4-6, 2006 World

Air Transport Summit/Annual General Meeting describes the event as follows:

> The WATS/AGM is a unique and exclusive industry forum, which brings together the Leaders of the world's most powerful airlines, their alliances and business Partners to debate the issues shaping the future of our industry. It is a unique opportunity to meet the Presidents, chief executive officers and senior executives of the world's airlines.
>
> WHAT IS THE AGM AND WHO ATTENDS?
>
> The Annual General Meeting (AGM) is IATA's pre-eminent event. In addition to the statutory obligations, the formalising of industry positions and the evidencing of airline unity, the AGM provides a focus for emerging industry issues and a forum for Members to meet and network. Over 600 representatives from IATA's Member Airlines, Industry Associate partners, international and regional associations, leading manufacturers and industry suppliers attend this meeting annually, accompanied by a large media contingent.

101.    Announcing the June 1-3, 2003 AGM in Washington, D.C., IATA characterized the event as follows:

> Renowned industry dignitaries and global delegates will . . . probe fundamental problems facing the industry and extrapolate potential solutions from other industries that have faced dramatic change.

102.    In a June 3, 2004 press release, IATA Director General and CEO Giovanni Bisignani set the tone for the 2004 AGM, held June 6-8, 2004, at the Shangri-La Hotel in Singapore:

> "The past three years tested the mettle of our industry as never before. While record high fuel prices challenge our profitability it is time to put our efforts towards rebuilding the industry," said Bisignani. "But it is no use rebuilding a structure that we know is weak. At this AGM we need to achieve consensus on a stronger, streamlined and lower-cost industry structure. And we need to convince our industry stakeholders of the need for change."

Among other gatherings, that AGM also included a "Chief Executives Forum." The 2005 AGM, held May 29-31, 2005, at the Hotel Nikko in Tokyo, Japan included a "Chief Executives Forum," briefing sessions, receptions and other group events. Several hundred delegates attended IATA AMGs with similar agendas in Shanghai, PRC, June 3-5, 2002; in Madrid, Spain, May 28-30, 2001; and Sydney, Australia, June 4-6, 2000.

103.    The International Air Cargo Association ("TIACA") sponsored the 20th International Air Cargo Forum and Exposition 2000 in at the Marriott Wardman Park Hotel in Washington, D.C. on September 27-30, 2000. In a news release touting the biennial event, Arthur Weldy, director of exhibits, said:

> The TIACA Air Cargo Forum and Exposition offers an extraordinary opportunity for air logistics professionals to network and do business with one another[.] This event draws thousands of executives from all sectors of the industry, about 80 percent of them presidents, CEOs executive vice presidents and directors of cargo – the decision makers. The networking and business atmosphere of the exhibit area is recognized as the best in the industry."

With the exception of Air Canada and Singapore Airlines, all of the defendants attended that event. The Air Cargo Forum sponsored breakfasts, lunches and dinners, plus numerous panels each day, including one titled: "Where Will The Money Come From?" It was at this event that SkyTeam announced it was extending its services to include air cargo with the launch of SkyTeam Cargo, a new alliance of AeroMexico Cargo, Air France Cargo, Delta Air Logistics and Korean Air Cargo, which SkyTeam described as the world's largest cargo airline alliance.

104.    In 2001, TIACA held its Annual General Meeting January 11-13 at the Hilton Dubai Jumeirah in Dubai, United Arab Emirates. This event included TIACA's "first-ever air cargo executive conference," a one-day event held January 13, 2001 that included speakers on the subject of "Managing Change for Profit and Survival." In the news release announcing the meeting quoted TIACA President Geoffrey Bridges said:

> "We created the executive conference to provide a more enriching professional experience for members attending the AGM (annual general meeting) and to give the meetings a new vitality and value[.] We are proud of the roster of highly respected and knowledgeable speakers we have lined up to incite dialogue among members and provide a provocative and stimulating day for management exploration and learning."

105.    TIACA's 2002 Annual General Meeting and Executive Conference took place January 11-14, 2002, on a cruise from Miami to Nassau, Bahamas aboard Majesty of the Seas, Royal

Caribbean Cruise Line . The event included the Air Cargo Executive Conference, all-day forums, breakfasts, lunches, dinners and a Captain's Cocktail Reception. The conference discussion topics included a panel on: "New Strategies Changing the Economies of Air Freight."

106.    Later that year, TIACA held its 21st International Air Cargo Forum and Exposition September 17-20, 2002, at the Exhibition Centre in Wanchai, Hong Kong. With a theme of "Air Commerce: New Challenges Ahead," the event attracted more than 3,000 people. Larry Coyne TIACA president, said in a news release:

> "This will be the biggest single forum and exposition in the history of air cargo. It is highly significant that despite a most challenging and unpredictable last 18 months, this is the one event the industry is not prepared to miss.
>
> "This is because in the space of just three or four days, businesses know they can meet more customers, partners and suppliers than they would otherwise probably see in a year if this event did not exist. It is a great place to network, to do business, to get ideas and to debate the issues of the day."

TIACA's calendar described the event as follows:

> The Forum will have a formal opening on 17 September, followed by two days of stimulating presentation, discussion and dialogue towards air cargo's next generation. Sessions will be held in the mornings to allow ample time for networking and exhibition.

107.    An estimated 200 people attended TIACA 's Annual General Meeting and Air Cargo Executive Conference, held February 23-25, 2003, at Centre des Congres de Reims, Reims, France. That event also included forums, speakers, meals and receptions. TIACA devoted two of four sessions to the subjects of: "Facilitation and Security - Reconciling Opposing Forces" and "Declining Yields – Who's to Blame and What Can be Done to Reverse Them?"

108.    Approximately 250 air carrier executives and others attended the Annual General Meeting and Air Cargo Executive Conference April 4-6, 2004, at Caesars Gautend Hotel Casino in Kempton Park, South Africa. The event included committee meetings, an Executive Council

Meeting, the Air Cargo Executive Conference and several forums.

109.    Billed "the world's premier air cargo event," TIACA's 2004 Air Cargo Forum, held September 14-17, 2004, at the Euskalduna Conference Center in Bilbao, Spain, drew more than 5,000 "air logistics executives," including delegates from more than 60 countries. The event featured a golf tournament, meals and forums, including a session titled: "What Price Security?"

110.    About 250 top executives of the air cargo industry and others gathered for TIACA's Annual General Meeting and Executive Conference of TIACA April 10-12, 2005, at the Ritz Carlton in Istanbul, Turkey. As it has in previous years, this event featured a one-on-one "Meeting Scheduler." According to a TIACA news release:

> The "Scheduler" is a complimentary, online service that will allow attendees to TIACA's 2005 Executive Conference & Annual General Meeting to easily schedule and manage meetings with other attendees BEFORE the event. Its purpose is to maximize attendees' networking opportunities DURING the event. Tuesday, April 12 from 2:00-5:00 pm has been set-aside specifically for this activity and a designated meeting area will be established onsite.

The event also included panels, elections and meals, including a "gala dinner."

### G.    Despite Intimations of Wrongful Conduct Beginning in July 2005, Defendants' Collusive Conduct Did Not Come to Light Until February 14, 2006.

111.    The European Shippers' Council ("ESC") expressed strong concerns with fuel surcharges in a July 8, 2005 press release:

> With press headlines reporting the continued upward direction of world oil prices one could be forgiven for thinking the surcharge announcements of shipping lines and air carriers reflected those headlines. However, the ESC is becoming increasingly sceptical on this point, and believes *some carriers are using the headlines to impose surcharges higher than they need to be.*
>
> *The rationale of the surcharge is widely considered to be the compensation for an abnormal rise in the price of fuel that wasn't valid at the time a contract was negotiated. It should just cover that cost and nothing else, but evidence suggests that this may not always be the case.*

Independent assessments, such as that conducted by Dynamar B.V., suggests that

31

these additional profit generated by shipping lines through their fuel surcharge mechanism, referred to as the Bunker Adjustment Factor (BAF), can amount to more than one million US dollar per ship per roundtrip, or hundreds of millions for industry as a whole .

*In airfreight the surcharges on fuel can represent 50% or more of the total freight rate and in some cases the surcharges are even higher than the actual airfreight rate itself. In such circumstances the rationale of the surcharge must be seriously questioned.* Furthermore, *despite different airlines having very different operational characteristics and economies they invariably seem to set nearly identical levels of fuel surcharges*. This raises the suspicion among many shippers that, rightly or wrongly, these surcharges represent some form of price agreement.

Members of the ESC Air Transport Council have raised several questions concerning the methodology by which fuel surcharges are calculated:

- Fuel surcharges for passenger air transport are based on the oil price of 2004, and yet the fuel surcharge index is based on the oil price of June 1996 when trade was at 18-20 USD per barrel. This figure seems totally unrealistic in view of today's oil price; why can it not be changed

- *It is well known that air freight carriers hedge on fuel. The 2004 Airline Business Magazine claimed that Lufthansa had hedged 80 - 90 % of its fuel requirements and saved EUR 90 million in the first half year of 2004 as a result*; so why are fuel surcharges required.

- *Why cannot fuel surcharges be differentiated between long haul and short haul flights, rather than the 'one surcharge fits all' approach, and effectively avoid short haul flights subsidising the fuel costs of long haul flights.*

The ESC would want to discuss the methodology of calculating fuel surcharges with the airlines in order to implement more transparency. Meanwhile ESC urges shippers to be cautious when confronted by notices of fuel surcharges - regardless of what the headlines say.

112.    On or about February 14, 2006, it became public knowledge that the U.S. Justice Department, the Federal Bureau of Investigation, the European Commission, the Competition Bureau of Canada, South Korea's Fair Trade Commission, and European national competition authorities (including but not limited to Switzerland's Weko), were investigating Defendants' Surcharge practices and had either raided Defendants' offices or made formal requests for information concerning their Surcharge pricing practices from Defendants.

113.    On February 14, 2006, United States Department of Justice spokesman John Nowacki announced that: "The Department of Justice is investigating the possibility of anti-competition practices in the air cargo industry and we are coordinating with the European Union and other foreign competition authorities."

114.    In an online report issued on February 14, 2006, *Air Cargo World* (http://www.aircargoworld.com/break_news/02142006d.htm), quoted a European Commission release stating that, "The Commission has reason to believe that the companies concerned may have violated (a European Union) treaty, which prohibits practices such as price fixing." According to the same report:

> Dr. Andrew Traill, head of air freight policy for U.K.-based Freight Transport Association, said, "Shippers have long since identified and been concerned by the application of very similar levels of surcharges applied by different airlines, in respect of fuel price increases, new security measures and other factors.

> "As such FTA welcomes the joint EU-US cartel probe on airlines and very much hopes that the investigation will be able to give the industry a clean bill of health. Shippers are entitled to expect to operate in an environment of keen commercial competition regarding both cost and service and events in the recent past have created doubts in confidence.

> "We look forward to the conclusions of this work with great interest," he said.

115.    On or about February 15, 2006, Defendant Air Canada reported that it had been contacted by the Competition Bureau of Canada in connection with an investigation of air carriers flying cargo between Canada and other counties.

116.    Interviewed at the Air France Asia 2006 show in Shanghai on February 15, 2006, Air France Cargo executive vice president Marc Boudier confirmed that officials had inspected documents at the Company's Paris office. In addition, the FBI confirmed that it had searched the Air France-KLM cargo terminal at O'Hare International Airport in Chicago, Illinois.

117.    On or about February 15, 2006, Defendant Asiana reported that South Korea Fair

Trade Commission investigators had spent three hours reviewing cargo department documents and computer files at Asiana's South Korea headquarters. Asiana confirmed that the investigation concerned fuel surcharges.

118.    On February 14, 2006, British Airways confirmed that it had received requests for information from both the United States Department of Justice and United Kingdom antitrust officials. In fact, the Federal Bureau of Investigation had raided British Airways facilities at New York's Kennedy Airport, and Chicago, Miami, San Francisco, and Long Beach, seizing computers and documents. In addition, United Kingdom antitrust officials raided British Airways facilities at Heathrow Airport in London.

119.    On February 14, 2006, Defendant Cargolux reported that it had been asked for information concerning alleged anticompetitive activities.

120.    On February 15, 2006, Defendant Cathay Pacific spokesperson Carolyn Leung confirmed that investigators had made "unannounced visits" to Cathay Pacific's offices in Los Angeles, San Francisco and Frankfurt, Germany.

121.    On February 15, 2006, Defendant Japan Airlines spokesperson Steve Pearlman reported that officials had searched Japan Airlines' offices in New York and Frankfurt, Germany.

122.    On or about February 15, 2006, it was reported that Fair Trade Commission of South Korea officials had visited Korean Air's headquarters.

123.    On or about February 15, 2006, Defendant LAN Cargo reported that United States authorities had visited its LAN Cargo division in Miami.

124.    On March 8, 2006, the *Wall Street Journal* reported that "Lufthansa offered to cooperate with federal prosecutors investigating possible price-fixing and collusion in the global air-cargo industry, which could give German's largest airline immunity from criminal charges if it provides evidence against the other carriers[.]"

125.    On or about February 15, 2006, Defendant Nippon Cargo reported that officials had contacted its JFK Airport office in New York, and that it had been ordered to appear before the United States District Court for the District of Columbia in April 2006.

126.    On February 15, 2006, Defendant SAS confirmed that European Commission officials had made an unannounced inspection of its SAS Cargo offices in Copenhagen. SAS acknowledged that officials were investigating possible agreements regarding surcharges to offset external cost increases for fuel, security measures, and war-risk insurance.

127.    On or about February 15, 2006, Defendant Singapore Airlines reported that it had provided information to investigating authorities.

128.    On or about February 15, 2006, Defendant Swiss Air reported that it had been contacted as part of the investigation.

129.    On or about February 15, 2006, Defendant Virgin Atlantic reported that the U.S. Department of Justice had requested information from its United States cargo division.

130.    In a February 15, 2006 press release, the ESC expressed its concern that fuel surcharges had been set collusively:

> The European Shippers' Council has welcomed investigations of the European Commission into cartel practices of the air cargo industry in several EU Member States. ESC Secretary General Nicolette van der Jagt said, "Shippers have since a long time been concerned about nearly identical levels of surcharges in respect of fuel price increases, new security measures and other factors. ***Despite different airlines having very different operational characteristics and economies they invariably seem to set very similar or even identical levels of surcharges.*** This has raised the suspicion among many shippers that these surcharges represent some form of price agreement."

> "Shippers therefore hope that this investigation can clear this up as it would help in the further building of customer confidence. Shippers have a right to expect airlines to operate in a competitive market as this helps drive down costs, increase efficiency, and ensure a customer focus in the provision of services. We look forward to the conclusions of this investigation."

131.    As reported in the *Wall Street Journal* on February 16, 2006:

Organizations that represent shippers argue that the surcharges, for extra fuel costs or added security measures, can significantly increase a cargo bill, often without detailed explanation. They also say that *while carriers are often very competitive in terms of their basic cargo rates, there seems to be a uniformity of prices when it comes to surcharges.*

132.    As reported in the *Guardian of London* on February 16, 2006:

Airlines around the world have been accused of using the September 11 terrorist attacks as a pretext for overcharging cargo customers by imposing unnecessary surcharges to cover "security" costs. ...In the wake of September 11, BA (British Airways) joined other carriers in introducing an "exceptional handling charge" of 9p a kilogram of freight, which was justified by the need for greater security. It has added a fuel levy that is linked to oil prices through a sliding scale and which currently stands at 34p a kilogram. Both measures have become common in the industry. ...*Shippers complain about surcharges amounting to half the overall costs of cargo transport.*

133.    As quoted in *Air Cargo World Online*:

The fuel surcharge "is a revenue item for the carriers," said Andy Williams of M33 Integrated Solutions, a third-party logistics operator. "Sure, their costs are going up dramatically, but the fuel surcharge is over-exceeding that cost.["]

**H.    Defendants Concealed Their Collusive Scheme.**

134.    Defendants concealed their collusive scheme by among other things announcing ostensibly differing criteria for raising and lowering their fuel surcharges. However, by design and in application, those different formulae have resulted in identical Surcharges imposed at or near the same times. At all relevant times, Defendants held themselves out to the public as competitors, when in fact they had combined and were conspiring to raise international air cargo shipping rates. As a result of that concealment, Plaintiff and the Class were prevented from discovering the conspiracy until February 14, 2006.

## ANTITRUST INJURY

135.    The above alleged combination and conspiracy has had the following effects, among others:

36

(a)    During the relevant period price competition in the sale of international air cargo shipping services by Defendants and their co-conspirators has been unlawfully restrained, suppressed and/or eliminated throughout the United States;

(b)    During the relevant period prices for international air cargo shipping services sold by Defendants and their co-conspirators have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

( c)    During the relevant period purchasers of international air cargo shipping services from Defendants and their co-conspirators have been deprived of the benefit of free and open competition in the purchase of international air cargo shipping services.

136.    As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Plaintiff and other members of the Class have been injured in their business and property in that they paid more for international air cargo shipping services than they otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

**DAMAGES**

137.    During the Class Period, Plaintiff and the other members of the Class purchased international air cargo shipping services from Defendants, or their subsidiaries, agents, and/or co-conspirators, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiff and the other members of the Class have sustained damages to their businesses and property in an amount to be determined at trial.

**FIRST CLAIM - VIOLATIONS OF 15 U.S.C. § 1**

37

138.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

139.    Beginning in at least 2000, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

140.    In particular, Defendants have combined and conspired to impose uniform fuel, war risk insurance and security Surcharges on international air cargo shippers as a means to raise prices for their services, rather than to recover actual costs.

141.    Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of international air cargo shipping services as herein alleged.

142.    The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of international air cargo shipping services they sold in the United States and elsewhere.

143.    For the purpose of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

        (a)    Participating in meetings and conversations to discuss the prices of international air cargo shipping services;

        (b)    Agreeing to manipulate prices and supply of international air cargo shipping services in a manner that deprived direct purchasers of free and open competition;

        (c)    Issuing price announcements and price quotations in accordance with the agreements reached; and

(d)    Selling international air cargo shipping services to customers in the United States at non-competitive prices.

144.    As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for international air cargo shipping services than they would have paid in the absence of Defendants' and their co-conspirators' price fixing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    A declaration that this action is a proper class action under Federal Rules of Civil Procedure, Rule 23(b)(3) on behalf of the Class as defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rules of Civil Procedure, Rule 23(c)(2), be given to each member of the Class;

B.    A declaration that the unlawful combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

D.    An award of damages to Plaintiff and each member of the Class, as provided by law, and  joint and several judgments in favor of Plaintiff and each member of the Class against

Defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

E.    An award to Plaintiffs and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

F.    An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable and proper.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.


DATED: May 22, 2006                **COHEN, MILSTEIN, HAUSFELD**
                                   **& TOLL, P.L.L.C.**

                                   By: _____
                                   Michael D. Hausfeld (D.D.C. Bar No. 153742)
                                   Paul T. Gallagher (D.D.C. Bar No. 439701)
                                   Andrew B. Bullion
                                   1100 New York Avenue, N.W.
                                   Suite 500, West Tower
                                   Washington, D.C.  20008
                                   Telephone: (202) 408-4600
                                   Facsimile: (202) 408-4699

                                   Terry Gross
                                   Adam C. Belsky
                                   Monique Alonso
                                   GROSS & BELSKY LLP
                                   180 Montgomery Street, Suite 2200
                                   San Francisco, California 94104
                                   Telephone: (415) 544-0200
                                   Facsimile:  (415) 544-0201

                                   Attorneys for Plaintiff DELINEAR, INC.